# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **IN RE:** | **CHAPTER 11** |
| **O & G LEASING, LLC, ET. AL.** | **CASE NO. 10-01851EE** |
| **Jointly Administered** | |

**O & G LEASING, LLC AND**
**PERFORMANCE DRILLING CO. LLC.**

**VS.**                                          **ADVERSARY NO. 10-00054EE**

**FIRST SECURITY BANK, AS TRUSTEE, and**
**DOE DEBENTURE HOLDERS 1-5000**


Hon. Douglas C. Noble                                    Attorneys for Debtors
McCraney Montagnet & Quin, PLLC
602 Steed Road, Suite 200
Ridgeland, MS 39157

Hon. Edwin Stephen Williams
Hon. Robert L. Holladay, Jr.
Young Williams PA
210 East Capitol Street, Suite 2000
Jackson, MS 39201

Hon. Jim F. Spencer, Jr.            Attorneys for First Security Bank, as Trustee, and
Hon. Cynthia Joyce Hall                         DOE Debenture Holders 1-5000
Hon. Paul H. Stephenson, III
Watkins & Eager, PLLC
Post Office Box 650
Jackson, MS 39205-0650

Hon. Stephen W. Rosenblatt
Hon. Christopher R. Maddux
Butler Snow O'Mara Stevens & Cannada
Post Office Box 6010
Ridgeland, MS 39158-6010


Edward Ellington, Judge

**MEMORANDUM OPINION**
**ON *FIRST SECURITY BANK AS***
**_TRUSTEE'S MOTION FOR SUMMARY JUDGMENT_**

**THIS MATTER** came before the Court on *First Security Bank as Trustee's Motion for Summary Judgment* (#34), *Plaintiffs' Response in Opposition to First Security Bank's Motion for Summary Judgment* (#40) filed by O & G Leasing, LLC and Performance Drilling Company, LLC. Having considered same and the respective briefs filed by the parties, the Court finds that summary judgment should be granted in favor of First Security Bank, as Trustee pursuant to the *Amended and Restated Trust Indenture.*

**FACTS**

O & G Leasing, LLC (O&G) and Performance Drilling Company, LLC (PDC) were created in 2006 for the purpose of owning and operating oil and gas drilling rigs. O&G owns the drilling rigs and leases them to PDC, its operating subsidiary. PDC seeks to obtain contracts with exploration companies, and PDC then provides the drilling rigs to drill for oil and gas.[1]

*Prior Debentures*

Beginning in 2006, and continuing over a three-year period, O&G[2] acquired a total of five (5) oil and gas drilling rigs. In order to finance the purchase and/or construction of each rig, O&G

---

[1]For a more detailed description of the business operations of O&G and PDC, see *Motion for Order Directing Joint Administration of Affiliated Cases Pursuant to Rule 1015(b)*, Case No. 10-01851EE, Docket No. 14, May 24, 2010.

[2]One of the debentures in 2006 was issued by PDC, rather than O&G, and was secured by Drilling Rig No. 1 (later changed to No. 22). PDC later transferred ownership of Drilling Rig No. 1 to O&G. Thereafter, all remaining debentures were issued solely by O&G. For purposes of this opinion, and because it makes no difference to the issue presented here, the Court will refer to O&G as the sole issuer of the debentures.

2

issued a series of debentures.[3]  First Security Bank (FSB) served as the indenture trustee for all of the debentures.  As of the end of 2008, O&G had issued a total of five series of debentures (Prior Debentures).  All of the Prior Debentures were secured by "the specific rig O&G purchased or constructed with the proceeds thereof.  Each series of Prior Debentures was issued under a particular trust indenture[,] . . . was secured by independent collateral (the particular rig financed) and contained varying revenue pledges and payment terms."  *Complaint for (I) Declaratory Judgment to Determine Validity, Priority and Extent of Liens, and (II) Avoidance of Preferential Transfers Under § 547,* Adversary No. 10-00054EE, Docket No. 1, ¶¶ 9 & 10, pp. 3-4, June 11, 2010.

To perfect FSB's security interest in each rig and its revenue, four separate Uniform Commercial Code financing statements (Prior UCC-1 Financing Statements) covering the particular rigs were filed with the Mississippi Secretary of State.  These Prior UCC-1 Financing Statements have not been terminated.

*2009 Exchange Offer*

The oil and gas drilling market collapsed in 2008.  According to O&G, "[o]il and natural gas prices dropped 40-60% and the number of rigs in use in the marketplace decreased by half based on reported utilization rates.  Due to lack of demand and utilization, and corresponding drop in drilling rates, [O&G's] revenues decreased substantially."[4]  In response to this drop in revenue, O&G

---

[3]Debentures are used by companies to raise capital without forfeiting control of the company's ownership.  Debentures are debts secured by the company's earning power.  Debentures is used interchangeably with notes and bonds.  The terms and conditions agreed to by the company and its debenture holders are legal loan contracts called indentures.  The indenture will define the terms of repayment and any other requirements, restrictions, and waivers.  *See Black's Law Dictionary* 460 & 838 (8th ed. 2009)

[4]*Complaint*, ¶ 11, p. 4.

3

negotiated an Exchange Offer[5] with FSB.

The Exchange Offer was an offer by O&G to exchange the Prior Debentures for one consolidated debenture (2009 Debenture). "The stated purpose of the consolidation plan was to simplify [O&G's] capital and debt structure and to balance the cash flows from all of O&G's rigs securing the prior Debentures in order to make the pledged revenue easier for [O&G] and [FSB] to manage."[6]

Pursuant to the Exchange Offer:

The purpose of this Exchange Offer . . . is to set forth certain information in connection with the offer by O&G Leasing, LLC . . . of its 10.50% Debentures, Senior Series 2009A [$25,955,000] . . . and 16.00% Debentures, Subordinate Series 2009B [$7,610,000] . . . which will be issued to [O&G's] existing Prior Debenture Holders in exchange for a like principal amount of the Prior Debentures. . . .The 2009A Debentures will be exchanged for a like amount of the senior debentures of each series of the Prior Debentures and the Subordinate Series 2009B Debentures will be exchanged for a like amount of the subordinate debentures of each series of the Prior Debentures.

. . . .

The Series 2009 Debentures are being issued under an Indenture of Trust (the "Indenture") dated as of September 1, 2009, between [O&G] and First Security Bank, Searcy, Arkansas, as the trustee. The Indenture is substantially the same as the indentures under which the Prior Debentures were issued and only changes and deviations from those prior indentures are described herein.

. . . .

[O&G] is proposing to make the Exchange Offer to simplify its capital and debt

---

[5]In simple terms, an exchange offer is an offer by a company to give one security, like stocks or bonds, in exchange for another security (other stocks or bonds). "For example, a firm may offer a new bond issue in exchange for an older series currently outstanding." Scott, David, L., *Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor.* Boston: Houghton Mifflin Co., 2003.

[6]*Id.* at ¶ 13, p. 4-5.

structure and to balance the case flow from each of [O&G's] drilling rigs.  Presently each series of Prior Debentures is secured as follows:

| SUMMARY OF TERMS OF THE PRIOR DEBENTURES | | | |
|---|---|---|---|
| | **RIG #3 (Series 2007A and B)** | **RIG #28/22 (Series 2008A and B)** | **RIG #14/48 (Series 2008C and D)** |
| **Collateral** | Rig #3 Drilling Equipment | Rig #28 Drilling Equipment and Rig #22 Drilling Equipment | Rig #14 Drilling Equipment and a subordinate interest in Rig #48 Drilling Equipment . . . . |

. . . .

[O&G] is proposing a unified structure pursuant to which all five (5) of the rigs shown above (Rigs 3, 14, 22, 28 and 48) and all of the Gross Pledgable Revenues from all of the rigs will be used as collateral and the payment source for the Series 2009 Debentures; provided, that, as to the Rig #48 Drilling Equipment, the security interest of the Debenture Holders will be, as is currently true for the Series 2008C and D Debentures, subject and subordinate to the lien of that certain loan to [O&G] from Washington State Bank secured by Rig #48. . . .

*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit F to Affidavit of Frank Faust (*Exchange Offer*), pp. 1-3.

In addition to the Exchange Offer, O&G executed an *Amended and Restated Trust Indenture* which consolidated the Prior Debentures into one debenture.  O&G also executed a *Closing Statement*.  The *Closing Statement* is O&G's certification that the information and/or representations in the Exchange Offer were true and correct, and a certification that O&G had signed the *Amended and Restated Trust Indenture*.  The *Closing Statement* and the *Amended and Restated Trust Indenture* are both dated September 15, 2009.

*2009 Security Agreement*

Finally, O&G executed an *Assignment of Drilling Contracts, Lease, Rents, Revenues and*

*Pledge and Security Agreement* (2009 Security Agreement). The 2009 Security Agreement is also

dated September 15, 2009. The 2009 Security Agreement was signed by O&G and PDC. The 2009

Security Agreement states in pertinent part:

> FIRST, by PERFORMANCE DRILLING, L.L.C., . . . in favor of O&G Leasing, Inc., . . . as security for the payment of all rents, fees and other liabilities . . . to O&G under that certain Lease Agreement dated September 15, 2009 . . . pursuant to which O&G has leased to Performance Drilling those certain drilling rigs more fully described in Schedule 1 to EXHIBIT A, attached hereto (**"Performance Drilling Rig #3; Performance Drilling Rig #22, Performance Drilling Rig #22[7], Performance Drilling Rig #14; and Performance Drilling Rig #48" or sometimes herein simply called "the Drilling Rigs"**); and

> SECOND, by O&G in favor of FIRST SECURITY BANK, Searcy, Arkansas, not in its individual capacity but solely as Trustee . . . under that certain Amended and Restated Trust Indenture dated as of September 15, 2009 by Trustee and O&G, as security for O&G's obligations under the Trust Indenture and for the benefit of the owners of the Debentures issued under the Trust Indenture . . . in order to induce the Debenture owners to exchange O&G's prior debentures (defined as (a) $5,800,000 9.25% Debentures, Series 2007A and $1,515,000 15.00% Subordinate Debentures, Series 2007B; (b) $17,600,000 10.00% Debentures, Series 2008A and $4,400,000 15.00% Subordinate Debentures, Series 2008B; and (c) $5,670,000 10.50% Debentures, Series 2008C and $2,500,000 16.00% Subordinate Debentures, Series 2008D . . . (further referred to herein collectively the "Prior Debentures") for its 10.50% Debentures, Senior Series 2009A and its 16.00% Subordinate Debentures, Series 2009B in the aggregate principal amount of $33,565,000, for the purpose of exchanging the Debentures for O&G's Prior Debentures (herein referred to as the "Exchange"), and thus to simplify O&G's capital and debt structure and to balance the cast flow from each of the Drilling Rigs.

> Furthermore, Performance Drilling hereby specifically recognizes and agrees that O&G has financed the Drilling Rigs through the issuance of the Debentures and that until the date the Debentures have been paid in full with interest, Performance Drilling joins with O&G to pledge the Drilling Rigs' Property (as defined below and more fully described in EXHIBIT A attached hereto) in favor of Secured Party to the full extent of Performance Drilling's interest therein

> In consideration of the foregoing and for other good and valuable consideration, the

---

[7]The 2009 Security Agreement refers to Drilling Rig #22 twice and does not mention Drilling Rig #28. None of the parties has raised this discrepancy, which appears to be a scrivener's error.

receipt and adequacy of which are hereby acknowledged, Performance Drilling and O&G, jointly and severally, hereby represent, warrant, covenant and agree to Secured Party and its successors and assigns the following:

1.  Grant of Security Interest.  FIRST, Performance Drilling hereby sells, transfers, conveys, sets over and assigns, absolutely, completely and unconditionally, all of its right, title and interest in, and further collaterally assigns, transfers and pledges to O&G; and SECOND Performance Drilling and O&G concurrently, jointly and severally in turn to hereby sell, transfer, convey, set over and assign, absolutely, completely and unconditionally, all of their right, title and interest in, and further collaterally assign, transfer and pledge to Secured Party, and grant to Secured Party a first and prior security interest in, all of Performance Drilling's and O&G's right, title and interest in and to that personal, intangible and other property which is more fully described in EXHIBIT A attached hereto, whether now existing or hereafter acquired, along with all proceeds associated therewith with a subordinate security interest in Drilling Rig #48 (collectively, the "Drilling Rigs Property"). . . .

It is acknowledged, agreed and understood that O&G is, contemporaneously herewith, issuing the Debentures, and securing the Debentures with a security interest in the Drilling Rigs Property and that Secured Party would not otherwise issue the Debentures and the owners of the Debentures would not purchase the Debentures absent the collateral enhancement being provided by the granting of the subject security interests.   Performance Drilling and O&G represent, warrant and acknowledge, respectively, that it is receiving good and valuable consideration in exchange for the granting of the subject security interests and that it will directly financially benefit as a result of the granting to Secured Party of the subject security interests.

*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit I to Affidavit of Frank Faust (*Assignment of Drilling Contracts, Lease, Rents, Revenues and Pledge and Security Agreement*), pp. 1-2. (emphasis added) (footnote added)

O&G and PDC admit that they signed the 2009 Security Agreement.[8]  However, O&G and PDC state that Exhibit A (Description of Collateral Exhibit) mentioned in the 2009 Security Agreement was not attached to the 2009 Security Agreement when O&G and PDC signed it.  O&G

---

[8]*Plaintiffs' Response in Opposition to First Security Bank's Motion for Summary Judgment; Affidavit* (of Ben O. Turnage), ¶ 5, p. 2.

and PDC allege that this rendered the 2009 Security Agreement unenforceable because it lacked a valid description of the collateral.

Under the terms of the 2009 Debentures, the O&G and PDC were required to begin interest-only payments on March 15, 2010.  O&G and PDC failed to make the first interest payment as required by the 2009 Debenture.

On March 9, 2010, FSB filed a UCC-1 Financing Statement (2010 UCC-1 Financing Statement) with the Mississippi Secretary of State's office.  The 2009 Security Agreement is described in the 2010 UCC-1.  In addition, the 2010 UCC-1 Financing Statement lists as collateral: Rig #3 Drilling Equipment; Rig #14 Drilling Equipment; Rig #22 Drilling Equipment; Rig #28 Drilling Equipment; and Rig #48 Drilling Equipment.[9]

On May 21, 2010, O&G and PDC filed separate petitions for relief under Chapter 11 of the United States Bankruptcy Code.  On May 27, 2011, the Court entered an *Order Directing Joint Administration of Affiliated Cases Pursuant to Rule 1015(b),* which consolidated the cases into the main bankruptcy of O&G (Case No. 10-01851EE).  For purposes of this opinion, the Court will refer to O&G and PDC collectively as the Debtor.

On June 6, 2011, the Debtor commenced the above-styled adversary proceeding with the filing of its *Complaint for (I) Declaratory Judgment to Determine Validity, Priority and Extent of Liens, and (II) Avoidance of Preferential Transfers Under § 547* (Complaint).  The Debtor seeks an adjudication that FSB's liens and security interests in the Debtor's drilling rigs are invalid because: (1) the 2009 Security Agreement lacks an adequate description of the collateral, (2) the 2010 UCC-1

---

[9]*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit K to Affidavit of Frank Faust (*UCC-1*), p. 2.

Financing Statement constitutes a preferential transfer pursuant to 11 U.S.C. § 547(b), [10] and (3) the 2009 Debenture is a complete novation of the Prior Debentures.

On July 16, 2010, the Honorable Daniel P. Jordan, III, signed the *Agreed Order Referring Case to Bankruptcy Court*, which referred to this Court the *Complaint* filed by FSB against O&G, PDC, and three other defendants in the United States District Court for the Southern District of Mississippi. The referred *Complaint* was assigned Adversary Case Number 10-00070EE. Along with several other grounds for relief, FSB's *Complaint* sought a judgment against the Debtor for the total amount of the unpaid 2009 Debenture.[11] On October 7, 2010, the *Agreed Order Granting Motion of O&G Leasing, LLC and Performance Drilling Company, LLC for Consolidation of Adversary Proceedings* (Docket No. 11) was entered in Adversary Case Number 10-00070EE consolidating Adversary Case Number 10-00070EE with the above styled-adversary.

On April 20, 2011, *First Security Bank as Trustee's Motion for Summary Judgment* and corresponding brief were filed. In its motion, FSB requests the Court to enter a judgment as a matter of law that it possesses a valid, properly perfected security interest in the Debtor's five drilling rigs.[12] On May 11, 2011, *Plaintiffs' Response in Opposition to First Security Bank's Motion for Summary Judgment* was filed by the Debtor. The Debtor filed its corresponding brief on May 12, 2011. FSB

---

[10]Hereinafter all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

[11]In its *Complaint,* FSB also requests the appointment of a special commissioner, appointment of a receiver, and costs and attorney fees. The Court notes that the scope of relief FSB requests in its summary judgment motion is narrower than the relief it requests in its *Complaint.*

[12]If the Court finds that FSB has a valid, properly perfected lien on the Debtor's five drilling rigs, FSB would have a first lien on all of the drilling rigs except for Drilling Rig #48. The parties all agree that FSB's lien on Drilling Rig #48 is subordinate to the first lien of Washington State Bank.

filed its rebuttal brief on May 31, 2011.

## CONCLUSIONS OF LAW

### I.  Jurisdiction

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(1) and (2)(K).

### II.  Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure,[13] as amended effective December 1, 2010,[14] provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, "the court does not weigh the evidence to determine the truth of the matter asserted but simply determines whether a genuine issue for trial exists, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. 2505, 2510 (1986)." *Newton v. Bank of America (In re Greene),* 2011 WL 864971, *4 (Bankr. E.D. Tenn. March 11, 2011).

"The moving party bears the burden of showing the . . . court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106

---

[13]Federal Rule of Civil Procedure 56 is made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056.

[14]The Notes of Advisory Committee to the 2010 amendments state that the standard for granting a motion for summary judgment has not changed, that is, there must be no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.  Further, "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases."

S.Ct. 2548, 91 L.Ed.2d 265 (1986)." *Hart v. Hairston,* 343 F. 3d 762, 764 (5th Cir. 2003).

Once a motion for summary judgment is pled and properly supported, the burden shifts to the non-moving party to prove that there are genuine disputes as to material facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials."[15] Or the non-moving party may "show[ ] that the materials cited do not establish the absence . . . of a genuine dispute."[16] When proving that there are genuine disputes as to material facts, the non-moving party cannot rely "solely on allegations or denials contained in the pleadings or 'mere scintilla of evidence in support of the nonmoving party will not be sufficient.' *Nye v. CSX Transp., Inc.,* 437 F. 3d 556, 563 (6th Cir. 2006); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S.Ct. 1348, 1356 (1986)." *Newton,* 2011 WL 864971 at *4. "[T]he nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action." *Malacara v. Garber,* 353 F. 3d 393, 404 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 106 S.Ct at 1356 (citations omitted).

When considering a motion for summary judgment, the court must view the pleadings and evidentiary material, and the reasonable inferences to be drawn therefrom, in the light most favorable to the non-moving party, and the motion should be granted only where there is no genuine issue of material fact. *Thatcher v. Brennan*, 657 F. Supp. 6, 7 (S.D. Miss. 1986), *aff'd*, 816 F.2d 675 (5th Cir. 1987)(citing *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070-71 (5th Cir. 1984)); *see also*

---

[15]Fed. R. Bankr. P. 7056(c)(1)(A).

[16]Fed. R. Bankr. P. 7056(c)(1)(B).

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538, 553 (1986). The court must decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d. 202 (1986).

### III.  Does FSB hold a valid security interest?

In a Chapter 11 case, the Debtor, as a debtor in possession, is granted the rights and duties of a trustee pursuant to § 1107. Under the *strong-arm clause* found in § 544, a debtor has the status of a bona fide purchaser who has a perfected lien on the assets of the debtor as of the time the case was commenced. The security interest of an unperfected creditor is defeated by the debtor's § 544 powers and is relegated to the status of an unsecured creditor. Therefore, if at the time of filing, FSB did not have a valid, properly perfected security interest in the five drilling rigs, then the lien established by § 544 would prime FSB, and FSB would be relegated to the status of an unsecured creditor.

### a.  Does the 2009 Security Agreement provide a description of the collateral sufficient for FSB's security interest to attach to the drilling rigs?

Section 75-9-102(73) of the Mississippi Code defines a *security agreement* as "an agreement that creates or provides for a security interest." Miss. Code § 75-9-102(73) (1972).[17] The attachment and enforceability of a security agreement is controlled by § 75-9-203. Section 75-9-203 states in pertinent part:

---

[17]In Section III(a) and (b) of this opinion only, all code sections refer to sections of the Mississippi Code unless otherwise noted.

12

### § 75-9-203.   Attachment and enforceability of security interest; proceeds; supporting obligations; formal requisites.

(a) A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, . . . .

(b) Except as otherwise provided . . . a security interest is enforceable against the debtor and third parties with respect to the collateral only if:

> (1) Value has been given;

> (2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

> (3) One (1) of the following conditions is met:

>> (A) The debtor has authenticated a security agreement that provides a description of the collateral . . . .

Miss. Code § 75-9-203(a) & (b) (1972).

Upon a review of the pleadings which have been filed in the adversary, the Court finds that there is no dispute that value has been given and that the Debtor has rights in the collateral.  The only element in dispute is the third element: whether the 2009 Security Agreement provides a description of the collateral sufficient for FSB's security interest to attach to the drilling rigs..

The sufficiency of a description is addressed in § 75-9-108.  Section 75-9-108 states in pertinent part:

### § 75-9-108.   Sufficiency of description.

(a) Except as otherwise provided in subsections (c), (d), and (e), a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.

(b) Except as otherwise provided in subsection (d), a description of collateral reasonably identifies the collateral if it identifies the collateral by:

> (1) Specific listing;

13

    (2) Category;
    (3) Except as otherwise provided in subsection (e), a type of
          collateral defined in the Uniform Commercial Code;
    (4) Quantity;
    (5) Computational or allocational formula or procedure; or
    (6) Except as otherwise provided in subsection (c), any other method,
          if the identity of the collateral is objectively determinable.

Miss. Code § 75-9-108(a) & (b) (1972).

"Any description of collateral is sufficient, even if it is not specific, so long as it reasonably identifies what is described.  In other words, the collateral may be described in general terms.  It should put a reasonably diligent person on notice that there may be a security interest in the collateral."  68A Am. Jur 2d *Secured Transactions* § 176 (2003) (footnotes omitted). The Uniform Commercial Code rejects a "mandatory exact and detailed description requirement" and a description is sufficient "if it reasonably identifies what is described, whether or not the description is specific."

7A Encyclopedia of Miss. Law *Secured Transactions* § 66:52 (2003)

In another treatise, *Corpus Juris Secundum,* the commentators detail what constitutes a sufficient description in a security agreement:

The test of sufficiency of such a description is that the description does the job it is assigned to do, namely to make possible the identification of the thing described. . . .

The principal function of the description requirement is to enable the parties themselves to identify the collateral, and if the parties to the agreement understand what collateral was pledged, the security interest cannot be challenged on the basis that the agreement insufficiently describes the collateral.  However, a security agreement should describe the collateral with details sufficient for third parties and subsequent creditors, upon a reasonable inquiry, to identify the collateral involved, and to enable a third party to distinguish between the collateral and other, similar goods that the debtor owns.  The description merely needs to raise a red flag to a third party, so as to indicate that more investigation may be necessary to determine whether an item is subject to a security interest.

79 C.J.S. *Secured Transactions* § 45 (June 2011) (footnotes omitted).

A security agreement is essentially a contract between the parties in which consensual liens are granted by one of the parties to secure its obligations. As with all contracts, a meeting of the minds is required.[18]

Upon a review of the documents submitted to the Court, it is clear that there was a meeting of the minds between the Debtor and FSB as to the specific collateral the Debtor pledged to FSB in order to secure the 2009 Debenture. As stated previously, the 2009 Exchange Offer was the offer presented by the Debtor to exchange the Prior Debentures for the 2009 Debenture. On page two of the 2009 Exchange Offer, the Debtor specifically lists and identifies the five drilling rigs which secured the Prior Debentures. On page three, the Debtor then states that

> [O&G] is proposing a unified structure pursuant to which all five (5) of the rigs shown above (**Rigs 3, 14, 22, 28 and 48**) and all of the Gross Pledgable Revenues from all of the rigs will be used as collateral and the payment source for the Series 2009 Debentures.[19]

In the *Amended and Restated Trust Indenture*, page two lists "Drilling Equipment" in the granting clause. On page 6, "Drilling Equipment" is defined as "the Rig #3 Drilling Equipment, the Rig #14 Drilling Equipment, the Rig #22 Drilling Equipment, The Rig #28 Drilling Equipment and the Rig #48 Drilling Equipment."[20] The 2009 Security Agreement contains the same listing of the drilling rigs on page one.[21]

---

[18]79 C.J.S. *Secured Transactions* § 31 (June 2011) (footnotes omitted)

[19]*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit F to Affidavit of Frank Faust (*Exchange Offer*), p. 3 (emphasis added).

[20]*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit G to Affidavit of Frank Faust (*Amended and Restated Trust Indenture*), p. 6.

[21]As noted previously, the 2009 Security Agreement appears to contain a typographical error on page one. Instead of listing Drilling Rig #28, the 2009 Security Agreement lists Drilling Rig #22 twice. The Court does not find the omission to be a fatal error for several reasons. First, Ben O.

15

As stated above, the description requirement in a security agreement serves to enable the parties to identify the collateral pledged. "[I]f the parties to the agreement understand what collateral was pledged, the security interest cannot be challenged on the basis that the agreement insufficiently describes the collateral."[22] The Court finds that it is clear that the Debtor intended to pledge, and did so pledge, the five drilling rigs as collateral to FSB in order to secure the 2009 Debenture. Therefore, the Debtor cannot challenge the description as being insufficient.

However, the case at bar raises an unusual situation. While the Debtor cannot challenge the description, the Debtor, as the debtor in possession, is a "third party" who is contesting the sufficiency of the description in the 2009 Security Agreement. Therefore, if the Court finds that the description is sufficient to raise a red flag to third parties that more investigation may be necessary, the description is sufficient for the attachment of the security interest.

In the case of *In re Moody*, the debtor asserted that the description of collateral in the security agreement he signed with Sears was legally insufficient. The description of the collateral in the security agreement stated that Sears maintained a security agreement in "all merchandise charged to the account." In reviewing Mississippi law, United States Bankruptcy Judge David W. Houston, III, held that in determining whether a description is legally sufficient, "the test is one of 'reasonable identification.'" *In re Moody,* 62 B.R. 282, 285 (Bankr. N.D. Miss. 1986). In finding that the Sears description met the test of giving reasonable identification of the collateral, Judge Houston quoted

---

Turnage states in his affidavit that over time the Debtor has changed the "number" names of several of the drilling rigs. Second, by listing the same drilling rig twice, the description would even more so "raise a red flag to a third party, so as to indicate that more investigation may be necessary to determine whether an item is subject to a security interest." 79 C.J.S. *Secured Transactions* § 45 (June 2011) (footnotes omitted).

[22] 79 C.J.S. *Secured Transactions* § 45 (June 2011) (footnotes omitted)

16

with favor from the case *Costner's Furniture, Inc. v. Cawthorn (In re Cawthorn),* 1 B.R. 267 (Bankr.

W.D. VA 1979):

> "[i]f the description gives 'notice' to a third party who upon reasonable inquiry can
> determine what is, in fact, included as collateral secured thereby it is sufficient." At
> 272. The court further interpreted that statement by saying that it "means that the
> third parties must inquire and ascertain once he is on 'notice'." (citations omitted).
> *Id.*

*In re Moody,* 62 B.R. at 285.

In a case of like posture as the case at bar, in *Greenville Riverboat, LLC v. Less, Getz &*

*Lipman, PLLC*, Greenville Marine Corporation (GMC) entered into an escrow and assignment

agreement with Rainbow. Rainbow also entered into a promissory note and security agreement with

GMC. Subsequently, several creditors obtained judgments against Rainbow. The judgment

creditors argued that the description of collateral in GMC's security agreement was insufficient to

create an enforceable security interest which would prime their judgments. The description in

question granted GMC a security interest in:

> the assignment of the right to secure the payments due under that certain agreement
> existing between Rainbow . . . and [GMC] as evidenced by that certain Escrow and
> Assignment Agreement between Rainbow . . . and [GMC] the terms and provisions
> of which are incorporated herein by reference.

*Greenville Riverboat, LLC v. Less, Getz & Lipman, PLLC,* 131 F.Supp. 2d 842, 848 (S.D. Miss.

2000).

In rejecting the judgment creditors' arguments, United States District Court Judge Tom S.

Lee found that the description was sufficient to identify the collateral securing the promissory note.

Judge Lee further found that if a creditor reviewed the escrow agreement specifically referenced in

the security agreement description, a creditor would clearly see that the promissory note was secured

by an unconditional assignment by Rainbow to GMC of certain funds.

17

Applying the test of reasonable identification to the case at bar, the Court finds that even with Exhibit A not being attached to the 2009 Security Agreement, the description of the collateral reasonably identifies the collateral to which FSB's security interest attached in order to place a third party on notice. On page one of the 2009 Security Agreement, it specifically lists the drilling rigs FSB was taking a security interest in: "Performance Drilling Rig #3; Performance Drilling Rig #22, Performance Drilling Rig #22[23], Performance Drilling Rig #14; and Performance Drilling Rig #48" or sometimes herein simply called "the Drilling Rigs."[24] The specific listing of five drilling rigs in the 2009 Security Agreement reasonably identified the collateral subject to FSB's lien. The description is sufficient "to raise a red flag to a third party, so as to indicate that more investigation may be necessary to determine whether an item is subject to a security interest." 79 C.J.S. *Secured Transactions* § 45 (June 2011) (footnotes omitted). Consequently, the Court finds that the description in the 2009 Security Agreement meets the test to reasonably identify the collateral and to put the Debtor, as debtor in possession, on notice of FSB's lien. Since the description is sufficient, the security interest attached to the collateral and FSB has a valid security interest in the five drilling rigs that may not be primed by the Debtor's strong-arm powers.

The Debtor cites the case of *Helms v. Certified Packing Corp.,* 551 F. 3d 675 (7th Cir. 2008) in support of its position that the description in the 2009 Security Agreement was not sufficient to grant FSB a security interest in the drilling rigs. However, *Helms* is clearly distinguishable from the case at bar. In *Helms*, the collateral in dispute was a commercial tort claim. In holding that the

---

[23]See footnote 19.

[24]*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit I to Affidavit of Frank Faust (*Assignment of Drilling Contracts, Lease, Rents, Revenues and Pledge and Security Agreement*), p. 1.

description was not sufficient, the Court of Appeals for the Seventh Circuit found "[f]or many types of collateral, the description in the security agreement need only name the type of collateral . . . such as accounts, equipment, and negotiable instruments." *Helms,* 551 F. 3d at 681 (citations omitted). However, the Seventh Circuit held that the same is not true of commercial tort claims. Similar to Miss. Code § 75-9-108(e), the law in the state of Illinois provides that a description only by type of collateral is not a sufficient description of a commercial tort claim. Since the security agreement in *Helms* never specified the commercial tort claim, the Seventh Circuit found the description to be insufficient. Unlike *Helms,* the collateral in question in the case at bar is not a commercial tort claim. The 2009 Security Agreement meets the standard established by the Seventh Circuit in *Helms*:  not only is the type of equipment listed, drilling rigs, but it goes further and states the specific numbers assigned by the Debtor to the five different rigs.

**b.  Is the 2009 Security Agreement unenforceable because the Description of Collateral Exhibit was attached after it was signed?**

As stated previously, the Debtor asserts that when he signed the 2009 Security Agreement, the Description of Collateral Exhibit was not attached. In *In re Allen,* 395 F.Supp 150 (E.D. Ill. 1975), the court addressed the same fact pattern as in the case at bar: the debtor signed the security agreement before the description of collateral was attached. The *Allen* court held that "a careful reading of § 9-203 and the following comments indicate that a security interest is created when the requirements listed in § 9-203(1)(a), (b) and (c) have been completed. There is no specific language requiring that the acts may be consummated in any particular order." *Allen,* 395 F.Supp. at 151.

In the treatise, *White & Summers UCC,* the *Allen* case is cited with approval:  "We agree that the events for attachment can happen *seriatim* and need occur in no particular order." 4 White & Summers, Uniform Commercial Code § 31-3, Creation and Perfection of Enforceable Article 9

19

Interests (6th ed. 2009) (2009 WL 3645561, 11).

Likewise, the court in *In re Levine's Delicatessen & Restaurant, Inc.,* 53 B.R. 430, 433 (Bankr. S.D.N.Y. 1985) held that a valid security agreement existed even though the schedule of collateral was attached after the security agreement had been signed by both parties.  The court found that the parties intended to create a security agreement, that a writing signed by both parties existed and that there was no evidence that the description of the collateral was incorrect.

"[A] debtor's signature in blank . . . implicitly authorizes the creditor to complete the security agreement, *according to the terms agreed to by the parties.*  We do not condone such a practice but we find no reason to invalidate security agreements so completed which conform to the agreement of the parties." *Rempa v. LaPorte Production Credit Assoc.,* 444 N.E. 2d 308, 313 (Ind. App. 1983) (footnote omitted).  "If a security agreement is signed in blank by the debtor and is completed so that it accurately reflects the parties' intent, a valid and binding security interest results."  68A Am Jur 2d *Secured Transactions* § 157 (2003).

The treatise *Lawrence's Anderson on the Uniform Commercial Code* addresses the situation of the description of collateral being attached after a security agreement is signed:

> The fact that a security agreement was signed before the description of the collateral was added does not invalidate the security interest in the absence of proof of fraud, mistake, or undue influence, since a security interest is created when certain conditions are satisfied and Article 9 *does not prescribe any sequence in which this must be done.*

8A Anderson U.C.C. § 9-203:79 (3d. ed.) (2011) (footnotes omitted) (emphasis added).

The Fifth Circuit addressed a similar issue in conjunction with a deed of trust which was signed in blank in *Glasscock v. Farmers Royalty Holding Co.,* 152 F. 2d 537 (5th Cir. 1945).  The Fifth Circuit found that when the grantor signed the deed in blank and gave authority for the

20

description to be added later, "such a deed, after the description has been properly filled in, would be operative to pass title. *Id.* at 539 (citations omitted). *See In re Schick Oil & Gas, Inc.,* 35 B.R. 282, 286 (Bankr. W.D. Okla. 1983)(valid mortgage may exist as long as bounds of authority are not breached).

The Debtor has not alleged that the Description of Collateral Exhibit which was attached to the 2009 Security Agreement sometime after the Debtor signed it does not accurately reflect the collateral it intended to give FSB a security interest in. To the contrary, in the *Affidavit* of Ben O. Turnage attached to *Plaintiffs' Response in Opposition to First Security Bank's Motion for Summary Judgment*, Mr. Turnage states

> My understanding, and belief as to FSB's understanding, based on communications with FSB and its lawyers, is that any security interest held by existing bondholders, and FSB as their trustee, would be "released" upon a refinance or other satisfaction of the existing bonds before the "new debentures" (and FSB as their trustee) could acquire a security interest in **the same collateral** held by the existing bondholders, and FSB as their trustee.[25]

Mr. Turnage clearly acknowledges that the Debtor intended to give a security interest in the same collateral that secured the Prior Debentures, namely the five drilling rigs.

The Debtor does not allege any fraud, mistake or undue influence on the part of FSB–at no point does the Debtor state that the Description of Collateral Exhibit does not accurately reflect what the Debtor intended to give FSB as security for the 2009 Security Agreement. Since "the Uniform Commercial Code does not prescribe any sequence in which the conditions for creation of a security agreement must be met,"[26] the fact that an exhibit that more fully described the collateral and which

---

[25]*Plaintiffs' Response in Opposition to First Security Bank's Motion for Summary Judgment; Affidavit* (of Ben O. Turnage), ¶ 23, p. 5 (emphasis added).

[26]68A Am Jur 2d *Secured Transactions* § 175 (footnote omitted).

accurately reflected the intent of the Debtor and FSB, was attached after the Debtor signed the 2009

Security Agreement and after value was given does not invalidate the liens. While the Court does

not believe that signing a security agreement that does not have all of the exhibits attached is the

wisest business decision, the Court does not "find [that to be a] reason to invalidate [a] security

agreement[] so completed which conform[s] to the agreement of the parties." *Rempa,* 444 N.E. 2d

at 313.

### c. Summary

In summary, the Court finds that the description of collateral found on page one of the 2009

Security Agreement is sufficient in that it reasonably describes the collateral and "gives 'notice' to

[the debtor in possession] who upon reasonable inquiry can determine what is, in fact, included as

collateral secured thereby." *In re Moody,* 62 B.R. at 285. In addition, since the UCC does not

prescribe any sequence to be used when creating a security interest, "the events for attachment can

happen *seriatim* and need occur in no particular order."[27] Therefore, the fact that the Description of

Collateral Exhibit, which accurately reflects the intention of the parties, was attached to the 2009

Security Agreement after the Debtor had signed it does not prevent the security interest from

attaching to the collateral under Mississippi law. Since FSB has a valid, properly perfected security

interest in the five drilling rigs, the Debtor may not use the strong-arm clause to prime FSB's lien.

### IV. Was the filing of the UCC-1 a voidable preference under § 547?

As noted above, with the issuance of each series of debentures, FSB filed a UCC-1 financing

statement with the Mississippi Secretary of State's office. The specific date each UCC-1 financing

---

[27]4 White & Summers, Uniform Commercial Code § 31-3, Creation and Perfection of Enforceable Article 9 Interests (6th ed. 2009) (2009 WL 3645561, 11).

22

statement was filed and the specific security for each UCC-1 financing statement are as follows:

| DATE FILED | SECURITY |
|---|---|
| September 14, 2006 | Rig No. 22 |
| April 10, 2007 | Rig No. 3 |
| June 19, 2008 | Rig Nos. 28 & 22 |
| October 30, 2008 | Rig Nos. 14 & 48 |
| March 9, 2010 | Rig Nos. 3, 14, 22, 28 & 48 |

*First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit K and Exhibit 2 to Affidavit of Frank Faust (*UCC-1s*).

The Debtor asserts that if the Court finds that the description in the 2009 Security Interest is sufficient to give FSB a valid security interest, then the 2009 Security Interest was not perfected because the 2010 UCC-1 Financing Statement should be avoided as a preference under 11 U.S.C. § 547.[28]  FSB, of course, alleges that it is not a preference.

Under Miss. Code § 75-9-310(a), the filing of a financing statement is required to perfect a security interest in equipment.  "The creation of a security interest in property is considered a transfer for purposes of § 547(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 101(54)*; Superior Bank, FSB v. Boyd (In re Lewis),* 398 F. 3d 735, 746 (6th Cir. 2005)."  *Moser v. JP Morgan Chase Bank, N.A. (In re Brown)*, 375 B.R. 348, 351 (Bankr. E.D. Tex. 2007).  However, the Court must determine whether it is an *avoidable* transfer under § 547(b).

A concise overview of § 547 is found in the *Brown* opinion:

Section 547(b) of the Bankruptcy Code authorizes the avoidance of a transfer of "an

---

[28]In Section IV, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

interest of the debtor in property" *if* five conditions are satisfied and *unless* one of seven exceptions defined in § 547(c) is applicable. The five characteristics of an avoidable transfer are that it (1) benefit a creditor; (2) be on account of antecedent debt; (3) be made while the debtor was insolvent; (4) be made within 90 days before bankruptcy (or one year if the creditor was an insider at the time of the transfer); and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. Section 547(g) expressly states that the debtor has the burden of proving the elements of a preferential transfer under subsection (b), and the creditor . . . against whom recover is sought has the burden of proving the non-avoidability of a transfer under subsection (c).

*Id.*

Since the 2010 UCC-1 Financing Statement was filed more than 30 days after the 2009 Security Agreement was entered into by the parties, under § 547(e)(2)(B), the transfer occurred at the time of perfection of the 2009 Security Agreement: on March 9, 2010, when the 2010 UCC-1 Financing Statement was filed. The Debtor filed bankruptcy on May 21, 2010. Therefore, there is no dispute that the transfer occurred within 90 days of the date the Debtor filed its petition.

In *Cage v. Wyo-Ben, Inc. (In re Ramba),* 437 F. 3d 457 (5th Cir. 2006), the Court of Appeals for the Fifth Circuit held that in order to be a voidable preference, the transfer must have depleted the bankruptcy estate. In *Ramba,* a creditor's security interest fully encumbered the debtor's assets; that is, the fair market value of the debtor's collateral was less than the amount owed, therefore the debtor had no equity in the collateral. The Fifth Circuit found that since there was no equity in the collateral, "[the debtor] had no interest in the transferred property other than bare legal title." *Id.* at 461. Further, in order for a transfer to be avoidable, "a voidable preference must have depleted the estate." *Id.* at 460. Consequently, the Fifth Circuit found that the transfer did not deplete the estate and was not voidable. *See* 5 *Collier on Bankruptcy* ¶ 547.03[2] (15th ed. revised); *Wind Power Systems, Inc. V. Cannon Financial Group, Inc. (In re Wind Power Systems, Inc.),* 841 F. 2d 288, 292 (9th Cir. 1988); *In re Southmark Corp.,* 49 F. 3d 1111, 1116-17 (5th Cir. 1995); *Coral Petroleum, Inc.*

24

*V. Banque Paribas-London,* 797 F. 2d 1351, 1355 (5th Cir. 1986).

After discussing the Fifth Circuit's holding in *Ramba,* the bankruptcy court in *Brown* found that the debtor's refinancing of the original loan amount of his mortgage and the subsequent perfection of the original loan amount of the mortgage did not result in a diminution of the debtor's estate, and therefore, the refinancing of the mortgage was not a preference under § 547.[29] "[W]hen a debtor exchanges one secured debt for another, the estate is not diminished. *See Shapiro v. Homecomings Financial Network, Inc. (In re Davis),* 319 B.R. 532, 536 (Bankr. E.D. Mich. 2005); *Gregory v. Community Credit Co. (In re Biggers),* 249 B.R. 873, 877-79 (Bankr. M.D. Tenn. 2000)." *In re Brown,* 375 B.R. at 353.

In *George v. Guaranty Mortgage Company, Inc. (In re Ljubic),* 363 B.R. 914 (Bankr. E.D. Wisc. 2007), Shelter Mortgage Company (Shelter) (predecessor in interest to Guaranty Mortgage Company) held two mortgages on the debtor's property. The debtor refinanced his two Shelter mortgages into one mortgage. Within 90 days of the deed being recorded, the debtor filed bankruptcy. The trustee attempted to set aside the Shelter refinanced mortgage. In finding that the Shelter refinanced mortgage was not a preference, the court held:

> There was no break in the chain of title, and the same creditor had a security interest before and after the refinance. The concept of a hypothetical bona fide purchaser is not so elastic, or tricky, as to allow the trustee to interrupt the chain of title when the same creditor had no interruption in the amount owed to it and no interruption in its interest shown in the public record.

*In re Ljubic,* 362 B.R. at 921.

Likewise, Judge Keith M. Lundin of the United States Bankruptcy Court for the Middle

---

[29]The court did find however that the additional money loaned to the debtor for home improvements did constitute a voidable preference. *In re Brown,* 375 B.R. at 353.

District of Tennessee found that the refinancing of a vehicle did not diminish the debtor's estate, and therefore, was not a voidable preference. "At no time during the preference period could any creditor have prevailed over the interest held by [the creditor]. The pickup was fully encumbered with no value available for the benefit of the estate. The refinancing lien lacked preferential effect for § 547 purposes." *Gregory v. Community Credit Co., (In re Biggers),* 249 B.R. 873, 878-79 (Bankr. M.D. Tenn. 2000).

Applying the holdings of *Ramba, Brown, Ljubic* and *Biggers* to the case at bar, the Court finds that the filing of the 2010 UCC-1 Financing Statement in order to perfect the 2009 Security Agreement is not a voidable transfer because it did not result in a diminution or depletion of the Debtor's estate. In its Complaint, the Debtor admits that "[e]ach series of Prior Debentures was issued under a particular trust indenture, . . . was secured by independent collateral (the particular rig financed) and contained varying revenue pledges and payment terms."[30]  The Debtor further states that the "Exchange Offer provided that the four (4) (*sic*)[31] rigs of O&G's that secured the Prior Debentures (and the revenues thereof) would be combined into a new, consolidated collateral pool as security and payment source for the new debentures." *Id.* Therefore, there is no dispute that the five drilling rigs were fully encumbered prior to the parties entering into the 2009 Security Agreement and that "[a]t no time during the preference period could any creditor have prevailed over the interest held by [FSB]." *In re Biggers,* 249 B.R. at 878.

As further evidence that the Debtor's estate was not diminished or depleted as a result of the

---

[30]*Complaint for (I) Declaratory Judgment to Determine Validity, Priority and Extent of Liens, and (II) Avoidance of Preferential Transfers Under § 547,* Adversary No. 10-00054EE, Docket No. 1, ¶¶ 9 & 10, p. 4, June 11, 2010.

[31]The Complaint states four rigs, however, there is no dispute that the Debtor has a total of five rigs pledged to FSB.

2009 Security Agreement, the combined amount owed on the Prior Debentures totaled $37,485,000.00. The 2009 Debenture was issued in the total amount of $33,565,000.00. Since the amount of the 2009 Debenture was less than what the Debtor owed for all of the Prior Debentures combined, the 2009 Debenture and 2009 Security Agreement did not improve FSB's position and did not diminish the expectations of the Debtor's other creditors.

Since the Debtor's estate has not been diminished or depleted, the filing of the 2010 UCC-1 Financing Statement is not a voidable preference. The Debtor cannot meet the requirement of § 547(b)(5) to show that FSB would receive a larger share of the Debtor's estate as a result of the transfer than it would receive had the transfer not been made.

Additionally, the filing of the 2010 UCC-1 Financing Statement is not a voidable preference because it does not meet the standards for a new transfer under § 547(e)(1)(B). Section 547(e)(1)(B) states that for the purposes of § 547, "a transfer of . . . property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(B). Therefore, if a transfer does not take value away from or diminish a debtor's estate, it cannot be a transfer within reach of § 547. As listed above, FSB duly filed Prior UCC-1 Financing Statements after each Prior Debenture was issued. These four Prior UCC-1 Financing Statements perfected FSB's interest in the Debtor's five drilling rigs. Pursuant to Miss. Code § 75-9-515(a) a financing statement is effective for a period of five (5) years after the date of filing. Since the four Prior UCC-1 Financing Statements had not been terminated, they were valid and of record at the time the Debtor filed its petition and there was no break in the perfection of FSB's security interest in the five drilling rigs.

The Court will note that no evidence has been presented to show that the Debtor demanded

27

that FSB file UCC-3 termination statements.  Some courts have held that the failure of a debtor to demand that the creditor file termination statements may be evidence of the debtor's intention that the creditor's security interest in the collateral was to continue.  *See* 68A Am Jur 2d *Secured Transactions* § 399 (2003); *Safe Deposit Bank and Trust Co. v. Berman (In re Fernandes Welding & Equipment Service, Inc.),* 393 F. 2d 401, 403 (1ˢᵗ Cir. 1968).

"The renewal of a lien or security interest is not a new transfer within the meaning of section 547 if it merely continues an existing interest; it does not diminish the collection of assets to be distributed among the general creditors."  *In re Wind Power Systems,* 841 F. 2d at 292.  FSB has been continuously and fully perfected in the five drilling rigs and at no time during the preference period could a creditor have obtained a judicial lien superior to the interest FSB has in the drilling rigs.  Consequently, the filing of the 2010 Financing Statement is not a new transfer within the reach of § 547.

## V. Was the 2009 Debenture a novation of the Prior Debentures?

The Supreme Court of Mississippi recently addressed the issue of what constitutes a novation.  In *Harris v. Griffith Water Well,* 26 So. 3d 338 (Miss. 2010), the court held:   The Restatement of Contracts defines novation as a contract that

> (a) discharges immediately a previous contractual duty or a duty to make compensation; and
>
> (b) creates a new contractual duty, and
>
> (c) includes as a party one who neither owed the previous duty nor was entitled to its performance.
>
> Restatement (First) of Contracts § 424 (1932).

*Harris,* 26 So. 3d at 341.

28

"[A] novation may occur where the debt remains the same, but a new debtor is substituted. In such event, the original debtor is acquitted, his obligation is extinguished, and the creditor contends himself with the obligation of the second debtor. The parties must intend novation for novation to be accomplished." *Mississippi Insurance Guaranty Assoc. v. MS Casualty Insurance Co.,* 947 So 2d. 865, 871 (Miss. 2006) (citations omitted). In addition, in order for a novation to occur, the creditor must assent, either directly or implied, to the novation. *Id.*

Applying these factors to the case at bar, it is clear that a novation did not occur because the Debtor was never discharged from the previous contractual duty. FSB never filed UCC-3 terminating statements to terminate its perfected interest in the Debtor's drilling rigs. *See United Display & Box, Inc. v. Midlantic Bank (In re United Display & Box, Inc.),* 198 B.R. 829, 831 (Bankr. M.D. Fla. 1996). In the Exchange Offer, the Debtor states that the five drilling rigs were pledged under the Prior Debentures. The Exchange Offer then expressly states that "[O&G is proposing a unified structure pursuant to which all five (5) of the rigs shown above (Rigs 3, 14, 22, 28 and 48) and all of the Gross Pledgable Revenues from all of the rigs will be used as collateral and the payment source for the Series 2009 Debentures . . . ."[32] Clearly, there was never a point in time after the Debtor entered into the first debenture or after the signing of the 2009 Debenture and 2009 Security Agreement that FSB ever released the Debtor from its obligations.

In addition, a novation did not occur because the parties to the Prior Debentures and the 2009 Security Agreement never changed. According to the Debtor, FSB desired to obtain additional parties as guarantors on the 2009 Debenture, but FSB failed to obtain their signatures. Indeed, in its

---

[32] *First Security Bank as Trustee's Motion for Summary Judgment*, Docket No #34, Exhibit F to Affidavit of Frank Faust (*Exchange Offer*), p. 3.

Complaint, the Debtor acknowledges that no other entity was a party: "The terms of the 2009 Indenture only apply to O&G, as issuer, and the Defendant Trustee [FSB], not SAJAC or PDC."[33] Since there is not another party on the *Amended and Restated Trust Indenture*, the *Closing Statement*, the Exchange Offer or the 2009 Security Agreement who neither owed FSB for the Prior Debentures nor was entitled to any performance under the Prior Debentures, the Exchange Offer and/or the 2009 Security Agreement did not result in a novation.

### CONCLUSION

In its Complaint, the Debtor alleges that FSB does not have a valid security interest in the Debtor's five drilling rigs, (1) because the description of the drilling rigs in the 2009 Security Agreement is insufficient under Mississippi Law to allow the security interest to attach to them and (2) because the Description of Collateral Exhibit was not attached to the 2009 Security Agreement until after the Debtor signed it. Even without the Description of Collateral Exhibit being attached, the Court finds that the 2009 Security Agreement, because it specifically lists the five drilling rigs on page one, reasonably identifies the collateral in order to give notice to third parties.

Further, the fact that the Description of Collateral Exhibit was attached to the 2009 Security Agreement after it was signed by the Debtor does not invalidate FSB's security interest. Regardless of the order they are completed, as long as the security agreement satisfies all of the elements under Miss. Code § 75-9-203, the security interest attaches to the collateral. Since there is no dispute that value was given and that the Debtor had rights in the collateral, either the description on page one is a sufficient description to reasonably identify the collateral or the attachment of the Description

---

[33]*Complaint for (I) Declaratory Judgment to Determine Validity, Priority and Extent of Liens, and (II) Avoidance of Preferential Transfers Under § 547,* Adversary No. 10-00054EE, Docket No. 1, ¶ 15, p. 5, June 11, 2010.

of Collateral Exhibit after the Debtor signed the 2009 Security Agreement is a sufficient description to reasonably identify the collateral–either way, the three elements of Miss. Code § 75-9-203 were met and the security interest attached to the five drilling rigs.

Since the Debtor's estate has not been diminished or depleted, the filing of the 2010 UCC-1 Financing Statement cannot be set aside as a preference.  Finally, the 2009 Debenture was not a novation under Mississippi law since the Debtor was never released of its obligations to FSB and since no new parties were added.

The Debtor has not shown the existence of any "disputes over facts that might affect the outcome of the suit under the governing law [in order to] properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct 2502, 2510, 91 L. Ed. 2d 202 (1986).  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party based on the applicable law in relation to the evidence presented. *Id.* at 249. Applying these standards as established by the Supreme Court, the Court finds that there is no dispute as to any material fact and that judgment should be granted in favor of FSB as a matter of law that FSB possesses a valid, properly perfected security interest in the Debtor's five drilling rigs.

In the *Complaint* FSB originally filed in the United States District Court, FSB sought a judgment against the Debtor for the total amount owed on the 2009 Debenture.  In addition, FSB sought the appointment of a special commissioner to conduct a foreclosure sale on the assets of the Debtor, the appointment of a receiver and a judgment for costs and attorney fees.  The Court notes that these issues may not be appropriate for adjudication in the above-styled adversary proceeding. It would appear that they are issues which would be more appropriately determined in the main case as contested matters rather than in this adversary proceeding.  In any event, the Court makes no

findings on these issues.

A separate judgment consistent with this opinion will be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

Edward Ellington
United States Bankruptcy Judge
Dated: August 26, 2011